UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:07-CV-231 F

| | | |
|---|---|---|
| PAMELA HENSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| JOHNSTON COUNTY BOARD OF | ) | |
| EDUCATION, and ANTHONY L. | ) | |
| PARKER, in his capacity as the | ) | |
| Superintendent of Johnston County | ) | |
| Schools and in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Defendants' Motion to Dismiss [DE-6]. The matter is ripe for disposition.

## I. STATEMENT OF THE CASE

On May 24, 2007, Plaintiff Pamela L. Hensley filed a Complaint and Demand for Jury Trial in the Johnston County Superior Court alleging violations of the First and Fourteenth Amendments of the United States Constitution, violations of the North Carolina Constitution, and violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). On June 20, 2007, Defendants filed a Notice of Removal to the United States District Court for the Eastern District of North Carolina. On June 25, 2007, the court granted Defendants an extension of time to respond to the Complaint, up to and including July 30, 2007. On July 30, 2007, Defendants filed a Motion to Dismiss all the claims in this action pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

## II. STATEMENT OF THE FACTS

Plaintiff Pamela Hensley ("Plaintiff" or "Hensley") began teaching in 1983 and became employed with the Johnston County school system in 1994. She was assigned to North Johnston Middle School in 1998, and taught eighth grade science at North Johnston Middle School between August 2000 and December 2005. According to Hensley, she has been recognized by her peers and employers as an exemplary teacher. She also has a congenital hearing impairment.

In December 2003, Hensley attended a curriculum seminar sponsored and presented by the North Carolina Center for the Advancement of Teachers ("NCCAT"), which is associated with the University of North Carolina and established by the North Carolina legislature in 1986. A teacher must apply to attend a NCCAT seminar, and the application must be approved by the teacher's principal. Hensley's application to attend the December 2003 seminar, which focused on teaching the topic of evolution in science classes was approved by her principal at North Johnston Middle School.

Hensley shared the seminar materials with her colleagues, and used the materials in the spring 2004 semester. In November 2004, Hensley again used the materials to present a lecture on the topic of evolution. A "lively discussion" ensued in the class after the lecture, but no student or parent raised any complaints regarding the class, until January 12, 2005. "Jane Doe," a parent of a girl in Hensley's class, complained to Hensley about her daughter's science grade. The next day, she and her husband, "John Doe," met with North Johnston Middle School Principal Ray Stott and alleged that their daughter's science grade was the result of Hensley retaliating against their daughter for comments she made during the class discussion on evolution.

2

Hensley alleges that Stott wrote a letter to the Does denying that Hensley had challenged any student's religious belief or that their daughter's grade was a result of retaliation. In response, John Doe wrote a letter to Stott on January 22, 2005, stating *inter alia* that it was Doe's "intention . . . to rid our school system of a 'teacher' that has proven antagonistic and rude when her beliefs are challenged by true **'Christian' students**.' " Compl. [DE-1-1] ¶ 15 (quotation marks and emphasis in original). He advised Stott: "You might be surprised at how your 'stock' could go up in our community if you choose to deal more harshly with Ms. Hensley." *Id.* He also observed: "You have an inferior teacher with a 'disability' who overcomes her 'perceived' shortcomings in life by forcing her 'Alternate Live [sic] Views' on children who have proven they don't subscribe to the same beliefs as her." *Id.*

In response to the Does' complaint, Stott, with the help of an attorney, conducted an extensive investigation. At the conclusion of the investigation, Stott sent a letter to Hensley, informing her that the review did not show that she retaliated against any student who supported religion or opposed evolution during her class's discussion. Mot. to Dismiss, Ex. 1 [DE-6-1]. Stott did, however, state that Hensley acknowledged the classroom discussion "got out of control" and informed her it "is imperative that you do not make religious statements about how the Bible could be interpreted as part of your classroom presentations." *Id.* He advised that the school system was working on guidelines for teaching evolution. He also observed that Hensley did not maintain a pace to cover the entire curriculum, and gave instructions to Hensley on how she should improve her grading practices. *Id.* According to Hensley, she never acknowledged the classroom discussion got of out control, and she takes issue with Stott's observations regarding her pacing of teaching and grading practices. Compl. ¶ 18.

3

Hensley alleges that during the school's investigation and afterwards, John Doe and his agents engaged in public communication, including communicating with mass media outlets, alleging his daughter had been victimized by Hensley and disclosing the grade his daughter received in the science class. Hensley alleges the Does were unhappy that her employment was not terminated, so they met with Defendant Anthony L. Parker, Superintendent of Johnston County Schools, on May 16, 2005. According to Hensley, during the meeting the Does demanded Hensley write a letter of apology to parents, admit she had attempted to impose her beliefs on students, and have a written reprimand placed in her personnel file. They also demanded she publicly admit she demonstrated "unconstitutional hostility against the beliefs of the Christian students in the classroom by questioning the literal content of the Bible and by teaching her theological position that the Bible contains errors," and that she be transferred out of the "North Johnston" school district and that she be assigned to teach a subject other than science. Compl. ¶ 21. Finally, the Does demanded the school make changes to its curriculum to include a religious view of the teaching of science.

Hensley contends that the school system began negotiating with the Does, and eventually acquiesced to the Does' demands. Hensley alleges that on August 12, 2005, Hensley met with representatives of the North Carolina Association of Educators ("NCAE"), including an attorney whom she believed was appointed by the NCAE to represent her interests. She alleges she was presented with a letter she believes was drafted by the attorneys representing the school system and the Does. According to Hensley, the proposed resolution of the Does' complaint included a provision that Hensley sign the letter and allow it to be disseminated to all the parents of the students in her eighth grade science class. The letter provided the following:

4

I am sending this letter to all the parents of the students in the first semester of my 8th grade AIG science class last year. This class included the teaching of evolution, as required by the state's standard course of instruction. While teaching evolution, the students and I had an open discussion about God, religion and evolution. I cannot recall the details of the discussion, but I know my intention was to allow everyone to express themselves freely on these topics.

The discussion led to comments about the Bible and how it should or should not be interpreted. This is the first time that I have participated in such a discussion with students, and I regret that certain students perceived that I was taking a position on how the Bible should be interpreted.

I have learned much from this experience and wish to assure you that I respect your right, and the right of your children, to decide your own views on religion and on the interpretation of the Bible. I know, under the Establishment Clause of our Constitution, that a teacher in the school setting is not to advance or disparage religion or the Bible. Further, I recognize that a teacher should not take a position favoring one religion, or one interpretation of the Bible, over another.

In the future, I will refrain from sharing my personal religious beliefs with the class. While I know my intentions were good and that this was an isolated situation, I do apologize for the manner in which I taught this particular class that day.

Compl., Ex. 1 [DE-1-1].

Hensley contends she did not want to sign the letter, but the NCAE representatives told her she should agree to the wording of the proposed letter because it would please her employer and because no one expected the Does to agree to the letter. Hensley alleges that "[b]ecause she felt pressured, [she] initially agreed to comply with the school's request to send the letter that had been written by the attorneys." Compl. ¶ 25.

According to Hensley, she then was informed in an email that, to everyone's surprise, the Does had agreed to the proposed resolution, including the letter. Hensley contends she then informed NCAE representatives that she felt the letter contained false statements and she had concerns about disseminating it to the parents. Hensley contends the NCAE attorney told her she

5

would explore alternatives to the drafting of the letter, but Hensley only received communications urging her to sign and disseminate the original letter. Indeed, Hensley alleges she was told by an unnamed person that by refusing to sign the letter, she might be putting her "career in jeopardy for insubordination." Compl. ¶ 28. Hensley still refused to sign the letter as originally drafted.

Hensley resumed her usual teaching assignments for the fall 2005 semester. On October 19, 2005, John Doe requested to speak with the Johnston County Board of Education at one of its meetings about a "legal matter and complaint." Compl. ¶ 31. Hensley alleges that one week later, Parker made the decision to remove her from her teaching position at North Johnston Middle School, but did not inform her of the decision at that time.

Instead, on November 29, 2005, Hensley was called to a meeting with Stott where he asked about her grades for the fall semester and whether, and how much time, she spent on the topic of evolution in her class. Hensley contends Stott also asked her about her sexual orientation.

Two days later, on Thursday, December 1, 2005, Hensley was summoned to a meeting with Parker and Joyce Wade, Associate Superintendent for Human Resources. Hensley contends at this meeting she was informed, for the first time, that she would be transferred to a position at South Campus Community School, and the transfer would be effective the following Monday, December 5, 2005. She was not told what her position at South Campus Community School would be, but she was presented with a letter from Parker that outlined his reasons for the transfer. The letter stated, in pertinent part, the following:

> The school system, with the assistance of legal counsel, carefully investigated this complaint and determined that you did not retaliate against the students. The school system's review did reveal some areas that you need to improve upon as set forth in your principal's April 4, 2005, letter to you. Overall, your manner of teaching evolution led to a classroom discussion that deviated from the curriculum. A number

6

of students recalled that you stated to the class that the Bible cannot be read literally. You could not remember making this comment, but you did acknowledge that the discussion got out of control. While you did not engage in any intentional misconduct, your manner of teaching this class and the other concerns reflected in the April 4th letter to you in part prompted this complaint.

The school system expended substantial time and resources attempting to resolve this matter and to avoid unnecessary and costly litigation. Among other things, the school system with its attorney carefully negotiated a possible resolution with the parents. This resolution included new guidelines on the teaching of evolution and training for teachers. The resolution hinged on your willingness to send an apology letter to the parents. The lawyer for the parents, our lawyer, and your lawyer worked on developing a letter that would satisfy all concerned, including you. I reviewed the proposed letter and found it to be constructive and appropriate. While I had every hope that you would be willing to send the letter in resolving a matter that you were partially responsible for creating, I decided not to compel you to send the letter.

Upon being informed that you agreed to the letter, I requested that our attorney move forward with the remaining steps of the proposed resolution. The school system completed multiple steps, including the new guidelines and the training. The school system was on the verge of finalizing the agreement. I was then informed that you changed your mind and decided that you would not send the apology letter. This sparked additional comments from the involved parents and exacerbated the situation. The matter still remains a source of tension and distraction within the school system, and it has diminished your credibility at North Johnston Middle School.

Based on this information, I believe it is in the best interest of the school system to transfer you from the North Johnston Middle School to South Campus Community Middle School, effective Monday, December 5, 2005. I believe this move will alleviate the tension and concerns arising from this matter and will enable you to re-establish your credibility at a new school. Your salary will remain the same.

Mot. to Dismiss, Ex. 2 [DE-6-2]. Hensley contends she advised Parker of her willingness to sign a revised letter, but he stated his decision was non-negotiable, as was his decision to transfer her immediately, rather than waiting until the end of the semester.

On December 3, 2005, Hensley sent an email to colleagues and parents explaining her involuntary transfer, and setting forth her view of the events of the investigation and the proposed

7

letter of apology. She also noted Parker's unwillingness to wait to transfer her until the end of the semester, and asked the rhetorical question: "What does this tell you about his interest in our students?" Compl. ¶ 37. Parker sent a letter to Hensley on December 9, 2005, stating he was not expecting Hensley to email others setting forth her version of the events, and that he would be considering the gravity of her conduct in deciding appropriate disciplinary measures.

Hensley thereafter filed a grievance pursuant to School Board Policy Code 5240, which allows an employee to challenge a decision of a school office that "violates a specified federal law [or] state law." Compl. ¶ 29. According to Hensley, an employee may appeal the decision to the Board of Education, where a committee hears the grievance and issues a final decision.

After filing the grievance, Hensley learned that she had been assigned to a remedial language arts position. Hensley contends the position is a "make-work" position, and not a legitimate teaching assignment. She alleges she asked Parker to select a position more accommodating to her hearing impairment and specifically asked him to select from one of eight advertised and available positions in the Johnston county school system. Hensley contends that Parker indicated, through his attorney, he would choose an alternative position only if Hensley agreed to withdraw her grievance and sign a complete release of all claims. Hensley declined to do so.

Hensley has applied for other teaching jobs in Johnston County, unsuccessfully. She alleges that the "make-work" position created by the Defendants, through which she often saw as few as three students a day, was an effort on the part of the Defendants to make her working environment intolerable. She contends she has been forced to find a teaching position outside of Johnston County.

8

## III. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of claims for "failure to state a claim upon which relief can be granted." A complaint must contain simply "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P.8(a)(2). However, a complaint is insufficient if it offers merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. Although consideration of matters outside the pleadings generally converts a dismissal motion under Rule 12(b)(6) to a motion for summary judgment, under certain circumstances a court may consider outside documents when ruling on a motion to dismiss. If a document is integral to and explicitly relied on in a complaint, and its authenticity is unchallenged, a court may consider it when ruling on a motion to dismiss. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Similarly, a court may consider official public records when ruling on a motion to dismiss. *Witthohn v. Fed. Ins. Co.*, 164 Fed. Appx. 395, 397 (4th Cir. 2006)(per curiam). Here, Defendants have filed along with their Motion to Dismiss the following documents: Stott's letter [DE-6-1], Parker's letter [DE-6-2], and Hensley's EEOC charge [DE-6-3]. Given that these documents are integral to Hensley's factual allegations, and that she does not contest their authenticity, the court may consider these documents.

## IV. ANALYSIS

Defendants move to dismiss all the claims against them, arguing: (1) Hensley's free speech claims must be dismissed because her speech was not a substantial factor in her job transfer and it did not address issues of public concern; (2) her claim for disparate treatment under the Equal

9

Protection Clause of the Fourteenth Amendment must be dismissed because she is not entitled to rely on the "class of one" theory; (3) her claims of state constitutional violations fail to state a claim, and state law provides an adequate remedy; (4) Hensley's claim for discrimination based on religion fails to state a claim and the court lacks subject matter jurisdiction over it; (5) her claim under the Americans with Disabilities Act fails to allege facts sufficient to support each element of the claim; (6) her claim for punitive damages must be dismissed, and (7) her claims against Defendant Parker in his individual capacity are barred by qualified immunity. The court will address each of these arguments in turn.

## A. Claim for violation of First Amendment rights under § 1983

Section 1983 is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Thus, to state a claim under § 1983, a plaintiff must allege facts showing the defendant violated "a right secured by the Constitution and laws of the United States" and that the deprivation of the right resulted from conduct "committed by a person acting under color of law." *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

Here, for purposes of this motion, Defendants do not dispute that they were acting under color of state law. The issue raised by Defendants' motion to dismiss, therefore, is whether Hensley has adequately alleged Defendants deprived her of rights secured by the First Amendment. Hensley alleges Defendants violated her First Amendment rights by transferring her to the South Campus Community School teaching position in retaliation for exercising her First Amendment rights. Defendants argue Hensley's § 1983 claim for violation of her First Amendment rights must be dismissed because (1) none of the matters of which Hensley "spoke" regarded a public concern, and

10

(2) she was not transferred because she engaged in speech, but rather because she reneged on her agreement to sign the letter. According to Defendants, her change of heart regarding signing the letter upset a delicate balance that had been struck between the school system and the Does. Defendants assert that it was the turmoil caused by this change of heart that was the motivation for Hensley's transfer, not her speech.

It is well-settled that "[a] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). Accordingly, "a public employer contravenes a public employee's First Amendment rights when it discharges or 'refuses to rehire [the] employee," or when it makes decisions relating to 'promotion, transfer, recall and hiring based on the exercise of' that employee's free speech rights." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006)(quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)).

In examining whether Hensley has stated a claim for retaliation based on the exercise of her First Amendment rights, the court must first identify what conduct Hensley alleges is protected by the First Amendment. In the Complaint, Hensley appears to rely upon both her refusal to sign the draft letter of apology and the email she sent subsequent to learning of her transfer. In her Response to the Motion to Dismiss, however, she limits her argument to her refusal to sign and disseminate the apology letter. *See* Response [DE-9] at pp. 8-13. The court, therefore, will focus its inquiry on Hensley's refusal to sign and disseminate the apology letter as it was drafted.

11

Ordinarily, a public employee who claims she was retaliated against for exercising her First Amendment rights alleges that she engaged in speech which is constitutionally protected. In such a case, the employee must satisfy the test set forth in *McVey v. Stacy*, 157 F.2d 271 (4th Cir. 1988):

> First, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. Second the employee's interest in the expression at issue must have outweighed the employer's interest in providing effective and efficient services to the public. Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action.

*Ridpath*, 447 F.3d at 316 (citing *McVey*, 157 F.2d at 277-78)(internal quotations marks and citations omitted). Here, however, Hensley alleges that she was retaliated against because she chose not to engage in speech, i.e., to sign and disseminate the apology letter.

The Supreme Court has made clear that the right not to speak is protected by the First Amendment and cannot be infringed absent a showing that the interest is overcome by a sufficiently countervailing interest of the State. *See, e.g., Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943)("To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind."); *Wooley v. Maynard*, 403 U.S. 705, 714-16 (1977)("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."). Hensley argues that so long as the speech act–here, the act of not signing the apology letter and distributing it to parents–"relates to matter of public concern" it should be protected. The court thinks Hensley's articulation of the governing law is not entirely accurate.

To demonstrate why Hensley's articulation of the law is not adequate, this court need only turn to a hypothetical explored by the Fourth Circuit in *Urofsky v. Gilmore,* 216 F.3d 401 (4th Cir.

12

2000). After recognizing that the focus on the capacity of the speaker matters, the court gave the following example:

> [S]uppose an assistant district attorney, at the District Attorney's direction, makes a formal statement to the press regarding an upcoming murder trial–a matter that is unquestionably of concern to the public. It cannot seriously be doubted that the assistant does not possess a First Amendment right to challenge his employer's instructions regarding the content of the statement. In contrast, when the same assistant district attorney writes a letter to the editor of the local newspaper to expose a pattern of prosecutorial malfeasance, the speech is entitled to constitutional protection because it is made in the employee's capacity as a private citizen and touches on matters of public concern.

*Urofsky*, 216 F.3d at 407-08 (footnote omitted). The Supreme Court's later opinion in *Garcetti v. Ceballos*, 549 U.S. 410 (2006), where the Court held that "[w]hen public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes and therefore are not insulated from 'managerial discipline' based on such statements," *id.* at 421, gives credence to the example set forth in *Ufrosky*. Accordingly, the court concludes the more precisely stated rule is that a public employee's refusal to speak is constitutionally protected if her government employer is compelling her to speak as a private citizen, and not as a public employee.

Again, the Supreme Court in *Garcetti* unambiguously held that speech pursuant to an employee's official job duties was not protected by the First Amendment. The Court left open, however, the issue of *how* to determine "the scope of an employee's duties in cases where there is room for serious debate." 547 U.S. at 424. In dicta, the Court observed the inquiry into the scope of an employee's duties is a "practical one," and "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a task in an employee's written job description is neither necessary nor sufficient to demonstrate that

13

conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25.

Even without guidance from the Supreme Court on how to determine the scope of an employee's "official duties" the court has little trouble concluding, as a matter of law, that Hensley was being compelled to speak as a public employee and not as a private citizen. At bottom, the purpose of the apology letter was to disclose Hensley's alleged in-class conduct and to apologize for any perceived unconstitutional conduct. In other words, the subject of the letter was entirely related to Hensley's employment duties. Although this factor is not itself dispositive, *see Garcetti*, 547 U.S. at 421, the text of the draft letter and the context in which Hensley was requested to sign and send it make clear she was *not* being asked to speak as a private citizen. Although Hensley alleges the Does had made the subject of their complaint public, the allegations in the Complaint show that Hensley herself was not asked to engage in the public debate as a private citizen. Rather, she received a "request" from her employer–via the NCAE representative–to communicate with and apologize to the parents of the students she taught. *See Hoffman v. Baltimore Police Dept.*, 379 F. Supp. 2d 778, 795-96 (D. Md. 2005)(dismissing a government attorney's "freedom not to speak" claim premised on his refusal to apologize to a client). The letter to be sent by Hensley was to have "official significance" and did not bear any similarities to communications by "private citizens." *See Garcetti*, 547 U.S. at 422, 424 (contrasting a memorandum prepared by a deputy prosecutor pursuant to his official duties with a teacher's letter to a local newspaper or an employee discussing politics with a coworker). The allegations in the Complaint, and the attached draft letter, simply make it implausible to find that Hensley was being asked to speak as a private citizen.

14

The court understands Hensley's frustration with ultimately being reassigned for her decision not to comply with her employer's "request" without prior indication that her refusal to send the letter would result in such consequences. At bottom, however, her decision not to send the letter requested by her employer, in her capacity as a teacher, is not protected by the First Amendment. Because Hensley was asked to speak in her official capacity as a public employee, her refusal to speak does not give rise to a claim for violation of her First Amendment rights, and the claim is DISMISSED.

## B. Equal Protection Claim

Hensley also alleges a claim under § 1983 for the alleged violation of her rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)(internal quotations omitted). To state a claim under the Equal Protection Clause, a plaintiff must plead sufficient facts to " 'demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional and purposeful discrimination.' " *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003)(quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Courts have applied a two-tier analysis when evaluating equal protection claims. *Hinton v. Conner*, 366 F. Supp. 2d 297, 313 (M.D.N.C. 2005). "Strict scrutiny applies if a person is treated differently based upon membership in a suspect class or because of the exercise of a fundamental right." *Id.* (citing *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)). The strict scrutiny standard requires the

15

government to show "that the classification it imposed was necessary to promote a compelling government interest." *Id.* In the absence of a disparate treatment of a suspect class or burden on the exercise of a fundamental right, "the government need only show a reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citing *Bd. of Trs. v. Garrett*, 531 U.S. 356, 267 (2001). Additionally, the United Sates Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Orech*, 528 U.S.562, 564 (2000). The "class of one theory," however, is inapplicable in the public employment context. *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 598 (2008).

Here, Hensley does not allege that she is a member of a "suspect class." Instead, she alleges she was treated "differently than other similarly-situated teachers and there was no rational basis for the difference in treatment." Compl. ¶ 56. Hensley appears to allege a quintessential "class of one" claim; moreover, in her memorandum opposing Defendants' motion to dismiss, she focuses her attention on the "class of one" theory of equal protection. *See* Response [DE-9] at pp. 17-19. Her "class of one" claim, however, is foreclosed by the Supreme Court's opinion in *Engquist.* Moreover, although Hensley does allege that Defendants' disparate treatment of her was due to "illegal animus" toward her, she does not allege or articulate the basis of that illegal animus. Because Hensley's equal protection claim appears to be based solely on a "class of one" theory and because that theory is inapplicable to the public employment context, her second claim for relief is DISMISSED.

## C. State Constitutional Claims

In addition to her claims that Defendants violated the United States Constitution, Hensley also alleges claims for violation of the North Carolina Constitution. Specifically, in her complaint, Hensley alleges violations of Sections 1, 13, 14 and 19 of Article I of the North Carolina Constitution. Defendants move to dismiss these claims, arguing Hensley fails to state a claim as to each of these sections, or alternatively, that she has another adequate remedy under state law which precludes her direct claims under the North Carolina Constitution.

Generally, a plaintiff may bring a direct claim under the North Carolina Constitution only if no other adequate state law remedy exists. *Corum v. Univ. of N.C.,* 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). Thus, to assert a direct constitutional claim, "a plaintiff must allege that no adequate state remedy exists to provide relief for the injury." *Copper ex rel. Copper v. Denlinger,* 363 N.C. 784, 788, 688 S.E.2d 426, 429 (2010). Here, the parties agree the absence of an "adequate state remedy" is essential to a direct claim under the North Carolina Constitution. The parties disagree, however, as to whether the facts, as alleged in the Complaint, show that an "adequate state remedy" exists for Hensley.

"An adequate state remedy exists if, assuming the plaintiff's claim is successful, the remedy would compensate the plaintiff for the *same injury* alleged in the direct constitutional claim." *Estate of Fennell ex rel. Fennell v. Stephenson,* 137 N.C. App. 430, 437, 528 S.E.2d 911, 915-16 (2000), *reversed in part on other grounds,* 354 N.C. 327, 554 S.E.2d 629 (2001). Moreover, an adequate remedy is one that "provide[s] the possibility of relief under the circumstances." *Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 340, 6478 S.E.2d 351, 355 (2009). Thus, "to be

17

considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." *Id.*

Defendants argue that N.C. Gen. Stat. § 115C-45 and N.C. Gen. Stat. § 150B-51 provide for review of Parker's decision to transfer Hensley, and thus she has an adequate state remedy. Specifically, Defendants note that under N.C. Gen. Stat. § 115C-45(c)(2), a person aggrieved by a "final administrative decision" has an appeal of right to the local board of education when the decision is challenged on the ground that it violates federal or state law. "[T]he term 'final administrative decision' means a decision of a school employee from which no further appeal to a school administrator is available." N.C. Gen. Stat. § 115C-45(c). An appeal of right under § 115C-45(c)(2) "may be further appealed to the superior court of the State on the grounds that the local board's decision is in violation of constitutional provisions." *Id.* The standard for judicial review for such an appeal is set forth in N.C. Gen. Stat. § 150B-51, found in North Carolina's Administrative Procedure Act. *See Overton v. Goldsboro City Bd. of Educ.*, 304 N.C. 312, 316-17, 283 S.E.2d 495, 498 (1981)(observing that Chapter 115 of the North Carolina General Statutes as it then existed failed to provide for any standard of review, but concluding that the standard of review in the Administrative Procedure Act should govern); *Warren v. New Hanover Co. Bd. of Educ.*, 104 N.C. App. 522, 528, 410 S.E.2d 232, 236 (1991)(explaining that an appeal of right under the predecessor statute to N.C. Gen. Stat. § 115C-45 is governed by the judicial standard of review set forth in the Administrative Procedure Act, N.C. Gen. Stat. § 150B-51). Accordingly, Defendants argue Hensley has an adequate state remedy to contest the alleged constitutional violations. In support of this contention, Defendants cite to cases where North Carolina courts have found that a

18

contested case hearing in the Office of Administrative Hearings, coupled with the right of judicial review pursuant to the Administrative Procedure Act, constitute an adequate remedy. *See Swain v. Elfland,* 145 N.C.App. 383, 391-92, 550 S.E.2d 530, 536 (2001); *Hawkins v. State,* 117 N.C.App. 615, 629, 453 S.E.2d 233, 241 (1995).

Hensley, however, argues the allegations in the complaint show that the review available to her "was deficient." Resp. [DE-9] at p. 24. Specifically, Hensley alleges in the Complaint that the grievance process used by the Board of Education "provides no mechanism for any kind of formal discovery of documents," and Parker "was not required to, nor did he, include all relevant documents on the record for the Board of Education." Compl. ¶ 40. She also alleges that she was not given the opportunity to question Parker about his decision. *Id.* Consequently, according to Hensley, the record before the Board of Education–and later the Superior Court, if she exercised her right to appeal–would not be "complete." Hensley asserts that this cannot constitute an adequate remedy.

Although no North Carolina appellate court has answered the precise question before this court, the North Carolina Supreme Court, when faced with different factual allegations, has held that § 115C-45(c) provides an adequate state remedy to redress a constitutional violation. *Copper,* 363 N.C. at 789; 688 S.E.2d at 429. In *Copper,* the estate of a former high school student sued the Durham Public Schools Board of Education, alleging the Board had violated the student's state constitutional right to procedural due process by denying him a hearing before his long-term suspension from school. *Id.* at 788, 688 S.E.2d at 428-29. The North Carolina Supreme Court observed that either § 115C-45(c) or § 115C-391(e) provided a means of redressing the student's alleged constitutional injury by allowing him to appeal to the Board and then to Superior Court. *Id.*

19

The court observed the complaint contained no allegations "suggesting the student was somehow barred from the doors of either the courthouse or the Board," or that the student exhausted his administrative remedies set forth in §§ 115C-45(c) or 115C-391(e), or that it was somehow futile to appeal his suspension to the Board, and later, if necessary, to Superior Court. Under those facts, the court concluded: "[U]nder our holdings in both *Corum* and *Craig*, an adequate remedy exists at state law to redress the alleged injury, and this direct constitutional claim is barred." *Id* at 789, 688 S.E.2d at 429.

Like the student in *Copper*, Hensley here had the opportunity pursuant to § 115C-45(c) to appeal Parker's decision to transfer her on the basis that it violated federal and state law. The decision in *Copper* strongly suggests that the North Carolina Supreme Court would conclude, under these facts, that § 115C-45(c) provides an adequate state remedy for Hensley such that her direct constitutional claims are barred. The main distinguishing fact between *Copper* and this case is Hensley's allegation regarding the alleged deficiency of the appeal process under § 115C-45(c). The court cannot conclude, however, that these allegations, if proven, show that the appeal process afforded Hensley was "futile." *See Jackson v. N.C. Dep't of Human Res.*, 131 N.C. App. 179, 186, 505 S.E.2d 899, 904 (1998)(explaining that although the plaintiff's complaint specifically alleged the futility of administrative review, the complaint must be carefully scrutinized to determine whether the available administrative remedies were indeed futile or inadequate). In this case, the factual allegations do not suggest that Hensley's appeal would be "futile." Although Hensley takes issue with the lack of discovery, there is no suggestion that her appeal would be useless as either a legal or practical matter. *Honig v. Doe*, 484 U.S. 305, 327 (1988).

Accordingly, this court predicts that the North Carolina Supreme Court would find that §
115C-45(c) provides an adequate state remedy for Hensley to redress the alleged state constitutional
violations. Consequently, her claims for violation of the North Carolina Constitution are
DISMISSED.[1]

**D. Title VII Claim**

The Board moves to dismiss Hensley's claim against it for religious discrimination under
Title VII of the Civil Rights Act of 1964, as amended. The Board argues that to the extent that
Hensley alleges a religious accommodation claim, such a claim fails because she did not allege a
bona fide religious belief in the Complaint. With regard to any alleged disparate treatment claim,
the Board argues, *inter alia*, that Hensley has failed to allege she is a member of protected class.
Hensley does not address these arguments as to her Title VII claim in her response to the motion to
dismiss.

The court agrees with the Board that Hensley has not stated a failure to accommodate claim
under Title VII, and adopts the reasoning set forth in the Defendants' memorandum [DE-7].

---

[1] Because the court finds that Hensley has an adequate state remedy, it need not consider
Defendants' arguments that Hensley's claims under Sections 1 and 19 Article I should be dismissed
because she was not deprived of fruits of her labor or a protected property interest. Hensley did not
respond to Defendants' argument that she cannot state a claim for violation of her rights under
Section 13 because she fails to identify any infringement of her religious liberty. The court agrees
with the reasoning set forth in the Defendants' memorandum [DE-7] as to that claim, and concludes,
alternatively, that Hensley's claim under Section 13 must be dismissed for the reasons set forth
therein. Finally, "[t]he standards for free-speech claims under the North Carolina Constitution are
substantially identical to those for free-speech claims under the federal constitution." *Munn-Goins
v. Bd. of Trustees of Bladen Com'ty College*, 658 F. Supp. 2d 713, 730-31 (E.D.N.C.
2009)(collecting cases). Accordingly, the court finds that Hensley's claim under Section 14 for
violation of free speech rights must be dismissed, alternatively, for the reasons set forth in the court's
discussion of her First Amendment claim.

21

Similarly, the court agrees that Hensley has failed to allege sufficient facts to support a disparate treatment claim. Her Title VII claim is therefore DISMISSED.

**E. ADA Claim**

The Board also moves to dismiss Hensley's claim against it under the ADA, arguing that the Complaint contains insufficient factual allegations to state a claim. Specifically, the Board argues the Complaint lacks factual "allegations of how [Hensley's] impairment limited her ability to perform the essential functions of her job, notification of such particulars provided to the employer, or a refusal on the part of the employer to discuss available options that would be targeted to such limitations." Mem. in Support of Mot. to Dismiss [DE-7] at p. 27.

The ADA prohibits discrimination by employers against qualified individuals with a disability. Discrimination under the ADA includes a failure to make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," 42 U.S.C. § 12112(b)(5)(A), and "denying employment opportunities to a job applicant or employee" where the denial of the employment opportunity is based on the need "to make reasonable accommodation." *Id.* § 12112(b)(5)(B). In a failure to accommodate case, the plaintiff must show "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)(quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). In unpublished opinions, the Fourth Circuit has stated that "[i]mplicit in the fourth element

22

is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atlantic Capital Mgmt.*, 131 Fed. Appx. 399, 400 (4th Cir. 2005)(per curiam)(citing 29 C.F.R. § 1630.2(o)(3)). *See also Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587489, at *4 (4th Cir. Oct. 25, 2000)(recognizing "[o]nce an employer's responsibility to provide a reasonable accommodation is triggered, it may be necessary for the employer to engage in an 'interactive process' to determine the appropriate accommodation under the circumstances").

Based on the allegations in the Complaint, the court finds that Hensley has included sufficient allegations to state a plausible claim for failure to accommodate under the ADA. Hensley alleges that she was "a qualified employee with a disability" and specifically alleges she has a hearing impairment, which she has had since birth, "that affects her ability to hear others' oral speech and to orally express speech in the same way that individuals without a hearing impairment express themselves through oral speech." Compl. ¶¶ 1, 8, 87. For purposes of this motion to dismiss, the court finds that such factual allegations are sufficient to satisfy the first element of a failure to accommodate claim.

With regard to the second element of a failure to accommodate claim—requiring the employer to have notice of the disability—the court also finds the factual allegations to be sufficient. Hensley alleges she "asked that defendants accommodate her disability with a more appropriate teaching assignment" and that she asked Parker to "select a position more accommodating to her hearing impairment." Compl. ¶¶ 1, 41. The Board contends these allegations are insufficient because Hensley has failed to allege, specifically, how her impairment limited her ability to perform the

23

essential functions of the language arts teaching position, and that she failed to allege she informed her employer of those specific limitations. The court finds this argument unavailing. The allegations are that Hensley has a hearing impairment–which affects both her ability to hear others oral speech and to orally express speech in the same way that individuals without a hearing impairment express themselves through oral speech–and that she informed Parker of the impairment and her opinion that she needed an accommodation. These allegations are sufficient–at this stage of the litigation–to establish the second element of Hensley's ADA claim. *See Schneider v. Giant of Maryland, LLC*, No. 09-1913, 2010 WL 2996965, at *6 (4th Cir. July 26, 2010)(citing *E.E.O.C. v. Federal Express Corp.*, 513 F.3d 360, 369 (4th Cir. 2008)("The burden to provide notice is not an onerous one: the employee does not need to mention the ADA or use the phrase 'reasonable accommodation,' but need only inform the employer of *both* the disability and the employee's need for accommodations for that disability.").

Finally, the Board attacks Hensley's allegations with regard to the fourth element of a failure to accommodate claim, which requires a plaintiff to allege facts showing that her employer refused to make a reasonable accommodation. The Board argues the Complaint only alleges that Hensley requested a specific accommodation–transfer to a vacant teaching position–and that Parker refused to consider that *specific* request unless Hensley released Defendants from any claims. According to the Board, the Complaint is silent as to whether other accommodations were offered to or discussed with Hensley. The Board contends that without such allegations, Hensley's ADA claim must fail.

Again, the court disagrees. In the Complaint, Hensley alleges the following:

Plaintiff is a qualified teacher with a hearing impairment that affects her ability to hear others' oral speech and to orally express speech in the same way that individuals

24

without a hearing impairment express themselves through oral speech. When plaintiff was assigned to teach language arts to students who would be identified as having deficiencies in verbal expression, plaintiff asked her employer to accommodate her disability by placing her in one of eight advertised, open teaching positions, within the Johnston County Schools which would not emphasize verbal expression.

Defendant responded to plaintiff's request stating that: "the school system is willing to consider Ms. Hensley's request that she not serve at South Campus and is willing to consider another assignment if it can be assured that a proposed alternative assignment would be in exchange for complete settlement and release of any and all issues or claims, including the grievance."

Compl. ¶¶ 87-88. These are sufficient factual allegations to allow the plausible inference that Parker's response to Hensley's request for an accommodation was limited to his statement that it would consider her request only if she released Defendants from any and all claims. In other words, the permissible inference is that this was Parker's only response, and did not offer any alternative accommodations in response to Hensley's request - nor anyone else affiliated with the school system. These factual allegations are sufficient to allow the inference that Hensley's employer refused to engage in the interactive process with Hensley to identify a reasonable accommodation. *See Haneke*, 131 Fed. Appx. at 400.

In sum, the court concludes that Hensley has included sufficient factual allegations to state a failure to accommodate claim under the ADA. Defendants' Motion to Dismiss is DENIED to the extent it applies to Hensley's ADA claim.

### F. Punitive Damages

In Hensley's claim under the ADA, she includes a request for punitive damages. Compl. ¶ 90. The Board contends that any "claim" for punitive damages must be dismissed.

25

Under 42 U.S.C. § 1981a(b)(1), government entities are exempt from punitive damages under the ADA. *See* 42 U.S.C. § 1981a(b)(1)("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency, or political subdivision) . . . ."). Municipal corporations qualify as "political subdivisions." *See Baker v. Runyon*, 114 F.3d 668, 671-72 (1997)("Clearly, it was our intent that the limitation on punitive damages would apply to Federal, State, and local governments.")(quoting 137 Cong. Rec. S29023 (daily ed. Oct. 20, 1991)(statement of Sen. Edward Kennedy)). Under North Carolina law, local school boards are governmental agencies. *See Overcash v. Statesville City Bd. of Educ.*, 83 N.C. App. 21, 22, 348 S.E.2d 524, 526 (1986)("A county or city board of education is a governmental agency."). Consequently, to the extent that Hensley purports to assert a claim for punitive damages under the ADA against the Board, such a claim must be DISMISSED.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [DE-6] is ALLOWED in part and DENIED in part. Specifically, the motion is DENIED with regard to Hensley's eighth claim for relief under the ADA. It is ALLOWED as to all other claims alleged by Hensley, and those claims are DISMISSED.[2]

SO ORDERED. This the 23rd day of December, 2010.

*James C. Fox*

James C. Fox
Senior United States District Judge

---

[2] Because all claims against Defendant Parker have been dismissed, the court does not reach his arguments regarding qualified immunity.